**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

                                 Case No. 13-CR-2225-MV

v.

JOSÉ MARTÍNEZ ENCINIAS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

José Martínez Encinias, who is currently housed at the low-security Federal Correctional Institution in Anthony, Texas ("FCI La Tuna"), seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Dkt. 1247. In support, Mr. Martínez Encinias cites various medical issues that he has experienced during his incarceration, including a weeklong hospitalization with COVID-19, as well as the risk of serious harm or death he faces given the ongoing existence of the virus. Dkts. 1247, 1247-1 at 8. The government opposes the motion. Dkt. 1253. As set forth in the remainder of this Order, the Court **GRANTS** Mr. Martínez Encinias' request, reducing his term of imprisonment to time served.

### BACKGROUND

Some ten years ago, Mr. Martínez Encinias was, in the government's words, a "poly-drug source of supply for, *inter alia*, a drug trafficking organization (DTO) run by co-defendant David Reynolds, and to a lesser extent by co-defendant Allen Cameron." Dkt. 931 at 1. His participation was uncovered over the course of a year-long investigation that ran from September 28, 2012 to December 12, 2013 and involved wiretaps of phones belonging to three of the 15 men ultimately prosecuted (Mr. Reynolds, Mr. Cameron, and Gene Solis). Final Presentence

1

Investigation Report ("PSR" (Dkt. 880)) ¶ 11. Through these wiretaps, law enforcement officers were able to establish Mr. Martínez Encinias' participation in the Reynolds DTO and obtain a search warrant for his home. PSR ¶ 21. The Bernalillo County Sheriff's Office executed the warrant on June 4, 2013 and seized 2,032 gross grams of heroin; 1,090 gross grams of cocaine; over $19,000 in cash; and 18 firearms.[1] PSR ¶¶ 22–23. Law enforcement detained Mr. Martínez Encinias as a result of the search. PSR ¶ 21.

About four months later, on October 29, 2013, the Court released Mr. Martínez Encinias to the third-party custody of his father. Dkt. 38. Mr. Martínez Encinias proceeded to spend the following three years, five months, and 14 days out of custody in progressively less restrictive conditions (first on home detention with his father, then at his own residence, and finally without GPS monitoring) based on his compliance. PSR ¶ 9. At no point during this period did Mr. Martínez Encinias test positive for drugs or alcohol. *Id*. Moreover, he maintained gainful employment as a heavy equipment operator throughout this period of legal limbo. PSR ¶ 72.

On March 29, 2017, with the benefit of a plea agreement (Dkt. 797), Mr. Martínez Encinias pleaded guilty to Count 10 of the Second Superseding Indictment (Dkt. 646) charging Possession with Intent to Distribute 500 Grams and More of Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); Count 17 of the Second Superseding Indictment charging Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c); and a one-count Information (Dkt. 794), charging Possession with Intent to Distribute 100 Grams and More of Heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). On April 11, 2017, as a

---

[1] Mr. Martínez Encinias asserted that only "a couple of the firearms possessed [were] for protection." PSR ¶ 28. Indeed, evidence supports that Mr. Martínez Encinias was a hunter who owned many of the firearms found for that purpose. *See* Dkt. 925-1 at 1, 6. After this conviction, however, he is no longer allowed to possess firearms.

result of his guilty plea, a magistrate judge remanded Mr. Martínez Encinias to the custody of the U.S. Marshal pending sentencing. Dkt. 812.

On May 31, 2017, the United States Probation Office ("Probation") disclosed Mr. Martínez Encinias' PSR, which assigned Mr. Martínez Encinias a total offense level of 31. PSR ¶ 41. With a criminal history score of zero (resulting in a criminal history category of I), his Guidelines range was preliminarily 108 to 135 months' imprisonment. PSR ¶¶ 45,80. However, Count 17 required an additional consecutive sentence of 60 months to life, increasing his effective Guidelines range to 168 to 195 months. PSR ¶ 80. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties instead agreed to a stipulated sentence of 135 months. Dkt. 797 at ¶ 14(a). Visiting Judge Michael J. Reagan accepted the plea agreement and sentenced Mr. Martínez Encinias to the 135-month recommendation on August 7, 2017.[2] Dkts. 938, 946.

In total, the government prosecuted fifteen members of the Reynolds DTO for their roles in making dangerous and highly addictive drugs available in New Mexico. *Id*. Mr. Martínez Encinias' PSR assigned each person a role within the organization, and the following chart summarizes these determinations and the sentences imposed on each. PSR ¶ 12. Mr. Martínez Encinias is the only man who remains incarcerated as a result of this prosecution even though the parties agree that he was not the group's leader. Dkt. 1253 at 2 ("These charges stemmed from a year-long investigation into a heroin and methamphetamine distribution ring operating in Albuquerque and Santa Fe, *led by co-defendant David Reynolds*." (emphasis added)).

---

[2] A native of New Mexico, Judge Reagan of the United States District Court for the Southern District of Illinois routinely assisted this District during a period of extreme caseloads. *See* Alicia A. Caldwell & Dan Frosch, *Immigration Cases, Judicial Vacancies Tax New Mexico Courts*, Wall St. J., (Oct. 19, 2019), https://www.wsj.com/articles/immigration-cases-judicial-vacancies-tax-new-mexico-courts-11571493600. The Court is grateful for his service.

| Name | Role | Sentence | Release Date |
|---|---|---|---|
| David Reynolds | Drug Distribution Leader | 96 months | 11/23/22 |
| Allen Cameron | Drug Distribution Organizer | 120 months | 02/08/23 |
| José Martínez Encinias | Supplier | 135 months | 06/14/26 (projected) |
| Humberto Hernández, Jr. | Supplier | 70 months | 01/10/19 |
| Gene Solis | Distributor | 60 months | 04/19/21 |
| Joe Sánchez | Driver/Surveillance | Probation | N/A |
| Erik Barros | Distributor | 84 months | 11/09/22 |
| Robert Herrera | Distributor | 24 months | 02/15/19 |
| Miguel Baca | Distributor | 37 months | 01/05/18 |
| Manuel Griego | Santa Fe Distributor | 36 months | 06/12/20 |
| Daniel Jirón | Mid-Level Distributor | 72 months | 01/17/20 |
| Arthur Gallegos | Runner/Stash House Operator | Probation | N/A |
| Christopher Ortega | Distributor | Probation | N/A |
| Teddy Archuleta | Distributor | 33 months, 24 days | 01/24/17 |
| Zebulun Smith | Distributor | 24 months | 04/05/17 |

As of the filing of this order, Mr. Martínez Encinias has been in custody for a total of 80 months and 9 days.[3] PSR at 2. According to the Bureau of Prisons ("BOP"), his projected release date, without the relief granted herein, is June 14, 2026. *Inmate Locator*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited June 27, 2023). The instant motion was filed on his behalf on August 8, 2022. Dkt. 1247. The government responded on September 30, 2022. Dkt 1253. This matter, now fully briefed, is ripe for the Court's consideration.

---

[3] With good time, he has served the equivalent of about 92 months.

## LEGAL STANDARD

18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act, allows

incarcerated persons to move for a sentence reduction in the district court after exhausting BOP

administrative remedies. *See United States v. Maumau*, 993 F.3d 821, 830 (10th Cir. 2021). A

district court may grant a motion for the reduction of a sentence "if three requirements are met:

(1) the district court finds that extraordinary and compelling reasons warrant such a reduction;

(2) the district court finds that such a reduction is consistent with applicable policy statements

issued by the Sentencing Commission; and (3) the district court considers the factors set forth in

§ 3553(a), to the extent that they are applicable." *Id.* at 831. However, because "the Commission

has been unable to comply with its statutory duty of promulgating a post-First Step Act policy

statement . . . the Sentencing Commission's existing policy statement is applicable only to

motions filed by the Director of the BOP, and not to motions filed directly by defendants." *Id*. at

836–37; *see also United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021). Thus, district

courts "possess the authority to determine for themselves what constitutes 'extraordinary and

compelling reasons'" on defendant-filed motions and are not bound by the Commission's current

policy statements. *Maumau*, 993 F.3d at 832, 836.

Still, courts may choose to look to the current policy statement—United States

Sentencing Guidelines §1B1.13—for non-binding guidance. *See United States v. Carr*, 851 F.

App'x 848, 853 (10th Cir. 2021) (noting that "it was within the district court's discretion to

conclude the application notes to USSG §1B1.13 still provided the best definition and

description of 'extraordinary and compelling reasons' under the circumstances" but that Tenth

Circuit case law required the district court to recognize that §1B1.13 was non-binding and to

"exercise its independent authority and discretion.").[4]

## DISCUSSION

On March 17, 2021, Mr. Martínez Encinias petitioned the BOP for compassionate release. Dkt. 1247-1 at 1. On April 12, 2021, the warden of FCC Florence denied the request. Dkt. 1247-2. The government does not dispute this series of events. Dkt. 1253 at 5. An individual may move to modify a term of imprisonment with a district court only after they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf *or* the lapse of 30 days from the receipt of such a request by the warden of [their] facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A) (emphasis added). Because this motion was filed 520 days after the initial BOP request, the Court finds that Mr. Martínez Encinias has satisfied 18 U.S.C. § 3582(c)(1)(A)'s exhaustion requirement. Dkt. 1247. *See also United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. July 15, 2020) (unpublished) (stating that the exhaustion requirement is satisfied if an individual has requested that the BOP move for compassionate release on their behalf and "thirty days have passed since the 'warden of the [individual]'s facility' received a compassionate-release request from [them]"). The principal issue raised by Mr. Martínez Encinias' motion thus is whether extraordinary and compelling reasons for early release exist that are not outweighed by the relevant statutory sentencing factors.

District courts exercise broad discretion in determining what constitutes extraordinary and compelling reasons for compassionate release. *United States v. Ford*, No. 23-3038, 2023 WL

---

[4] Amendments to USSG §1B1.13 have been adopted and, unless Congress acts, a new policy statement will go into effect on November 1, 2023. *See Amendments to the Sentencing Guidelines*, U.S. SENT'G COMM'N, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (April 27, 2023).

3829725, at *1 (10th Cir. June 6, 2023) (Tymkovich, C.J., concurring) (citing *Maumau*, 993 F.3d at 838)). Mr. Martínez Encinias argues that his serious health conditions (long COVID, chronic lower back pain, chronic migraines, hyperlipidemia, a rotator cuff tear or rupture of the shoulder, and a large abscess on his left elbow) combined with the ongoing threat of COVID-19 justify his compassionate release. Dkt. 1247 at 3. The government disagrees. Dkt. 1253. The Court finds the parties' arguments largely unavailing but will release Mr. Martínez Encinias for the reasons set forth below.

### I.   The uniquely harsh experience of the COVID-19 pandemic in prison is an extraordinary and compelling circumstance that supports a sentence reduction.

The COVID-19 pandemic has been the most extreme public health crisis of the last century, affecting each of us in ways we are still laboring to understand. Its costs can be both straightforward (1,127,152 deaths nationwide as of July 12, 2023[5]) and difficult to measure (the developmental harm to our children[6]). Locally, this Court has seen firsthand the pandemic's effects in the prosecution of individuals whose criminal behavior was tied to the economic havoc it wreaked. *See, e.g., United States v. Wise*, No. 20-CR-1897-MV (in which Ms. Wise, a mother of eight with no criminal history, having lost her home and job as a result of the pandemic, succumbed to drug addiction, and was charged with methamphetamine distribution). With

---

[5] *United States of America: WHO Coronavirus Disease Dashboard*, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/us (last visited Jul. 14, 2023).

[6] Alia Wong, *Pandemic babies are behind after years of stress, isolation affected brain development*, USA TODAY, (Jun. 9, 2022), https://www.usatoday.com/in-depth/news/education/2022/06/09/pandemic-babies-now-toddlers-delayed-development-heres-why/9660318002/.

resources and services put on hold, the pandemic also corresponded with an increase in the number of supervised release violations the Court has adjudicated.[7]

Most tragically, the Court witnessed the pandemic become "a death sentence" for people sentenced to the custody of the BOP. *United States v. McKinstry*, No. CR. 21-50020-JLV, 2023 WL 4082954, at *4 (D.S.D. June 20, 2023). Nationwide, at least 2,933 individuals have died of COVID-19 while in custody.[8] Of those lives lost, our district contributed at least nine. Three of those nine were sentenced by this Court. In the time since the pandemic's inception, we have come to understand the extreme vulnerability of incarcerated individuals to COVID-19. *See, e.g.*, Jennifer Valentino-DeVries & Allie Pitchon, *As the Pandemic Swept America, Deaths in Prisons Rose Nearly 50 Percent*, N.Y. TIMES, (Feb. 19, 2023), https://www.nytimes.com/2023/02/19/us/covid-prison-deaths.html ("[A]n examination of the data . . . underscored how quickly the virus rampaged through crowded facilities, and how an aging inmate population, a correctional staffing shortage and ill-equipped medical personnel combined to make prisoners especially vulnerable during the worst public health crisis in a century.").

Consider the lives of the three people this Court sentenced to prison who died after contracting COVID-19. Charley Haswood, a 55-year-old Diné man, was sentenced to 132 months in prison on March 5, 2020—eight days before then-President Donald J. Trump declared

---

[7] This Court oversaw 68 revocations in 2019. In 2020, even including the several months in which no incarcerated people could appear before the Court, 77 hearings on supervised release violations were held. That number peaked at 85 in 2021.

[8] *National COVID-19 Statistics*, THE COVID PRISON PROJECT, https://covidprisonproject.com/ (last visited Jul. 14, 2023).

a national emergency.[9] *See* Dkt. 57, *United States v. Haswood*, No. 19-CR-408-MV. Himself a victim of childhood sexual abuse and other significant trauma, Mr. Haswood was convicted of abusive sexual contact in Indian Country for reportedly "tickling" his minor son's genitals on several occasions. Dkts. 47, 52. At sentencing, after considerable reflection, he described his goals for his time in custody: "[T]o use the rehab to my advantage and help someone understand and not to hurt anyone else. I just want to make the best of the years I have left and to show respect to everyone I meet." Dkt. 63 at 17. Wiping away tears, he made his regret clear: "I just want to say I am sorry for hurting my two boys. I miss them." *Id*. at 16.

His death unfolded like so many during the pandemic's darkest days. Mr. Haswood put in a sick call request at the Otero County Prison on May 25, 2020, in which he wrote:

> Cough up blood w/ mucus. Sweating cold chills. Throwing up. I keep telling that I don't have a [spleen]. It just seems they don't care. I[t] feels like I'm struggling for my breath. At least give me some [aspirin]. I sometime[s] go into panic mode when I can't breath[e]."

Haswood Medical Records at 23. He had been experiencing coughing and congestion for the previous two weeks and had been in custody without his anticoagulants and asthma inhalers for the previous month. *Id*. at 29. Moreover, he reported that other people in custody had similar symptoms: coughs, difficulties breathing, and fevers. *Id*. After he began experiencing respiratory distress, prison staff transferred him to the University Medical Center in El Paso, Texas where medical staff placed him on a ventilator before intubating him. Emails from Richard Reifenscheid, Detention Management Inspector, U.S. Marshals Service, to Linda Zieba-Romero, Courtroom Deputy to the Hon. Martha Vázquez, et al. (May 26, 27, 31 & Jun. 13, 2020).  His

---

[9] Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

condition then deteriorated so much that he reportedly flatlined briefly before hospital staff were able to revive him. *Id*. He remained in critical condition ("very fragile") for the following four days, at which point hospital staff requested contact information for his family in order to "make arrangements." *Id*. He had served 21 months and 14 days in custody when he died of complications related to COVID-19 (cardiac arrest) at approximately 7:43 P.M. on June 13, 2020. *Id*.

Benjamin Márquez, a 49-year-old Latino man who suffered from mental illness, died of COVID-19 on August 12, 2020. Indicted on five drug charges, Mr. Márquez entered into a plea agreement for a custodial sentence of 60 months. *See* Dkt. 48, *United States v. Márquez*, No. 16-CR-3209-MV. Seriously addicted to a number of drugs from a very young age, he had been selling heroin and methamphetamine on behalf of his supplier and co-defendant for $50-100 per transaction to support his habit. Dkts. 53, 66, 77. His supplier, meanwhile, was sentenced to 41 months in custody (and released on March 1, 2019[10]). Dkt. 81. In a letter dictated to his attorney and addressed to the Court at sentencing, Mr. Márquez closed with this line: "I will raise my grandkids not to be the way I was." Dkt. 79-2.

Records from July 31, 2020 document that a doctor treating Mr. Márquez—who suffered from multiple underlying health conditions, including cirrhosis, ascites, a bacterial skin infection, and portal vein thrombosis—noted that compassionate release or home confinement would "be considered" in his case. Márquez BOP Medical Records at 19. Six days later, on August 6, 2020, that same physician wrote that compassionate release or home confinement "*need[ed]* to be considered." *Id*. at 16–18 (emphasis added). Two days later, Mr. Márquez tested positive for

---

[10] *Inmate Locator*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited July 6, 2023).

COVID-19. Another four days later, he passed away—four months and five days shy of release. Dkt. 53.

Before Mr. Márquez was designated within the BOP, the doctor who conducted his psychological evaluation asked him about his experience behind bars. Dkt. 66. His interests in jail included listening to the radio and "taking off into fantasy land." *Id*. at 2. When asked what he meant by the latter statement, he stated that he created his own world in his mind. *Id*. Queried about his relationship with correctional officers, Mr. Márquez said that some cared and others treated him like garbage. *Id*. About his time in custody, the doctor also noted: "There are crying episodes." *Id*. When he asked what was behind the tears, Mr. Márquez responded, "hunger, [lack of] sleep." *Id*. When asked what his three wishes on a deserted island would be, Mr. Márquez wished to be at home, to have food, and to have money to pay bills. *Id*. at 7.

As far as the Court is aware, Michael Gerard Smith, a 59-year-old Black man, was the last person sentenced before this Court who passed away as a result of COVID-19. Mr. Smith was a man with a considerable history of mental health challenges (schizoaffective disorder, bipolar disorder, major depressive disorder, PTSD), substance abuse issues, homelessness, and trauma, who was serving a mandatory 60-month prison sentence for Possession with Intent to Distribute 50 Grams and More of a Mixture and Substance Containing Methamphetamine. Law enforcement arrested Mr. Smith following a controlled buy of heroin and methamphetamine from the hotel room in which he lived and sold drugs. Dkt. 31 at ¶¶ 11, 16. He reportedly did so to support his drug use and "make money so that [he] could have a place to stay." Dkts. 38 at 7, 31 at ¶ 22. Despite a much higher Guidelines range (188–235 months), the parties recommended a 60-month sentence given Mr. Smith's deeply traumatic history. Dkts. 38, 44. The government made the following remarks in its sentencing memorandum:

The government does not believe that a sentence of 60 months is unreasonable in this case. A sentence within the advisory guideline would constitute a life sentence. Indeed, it would perhaps be more humane for the defendant to spend the rest of his life in prison where at least he will be fed and have a place to live. As it is, the defendant will get out of prison when he in his sixties. Based on his age, mental illness, criminal record and lack of education, it will be almost impossible for him to find a job. He will be without retirement or income and may still be suffering from mental illness.

The prognosis for the remainder of the defendant's life is dire.

Dkt. 44 at 1.

The government's words proved painfully prescient. On November 17, 2020, Mr. Smith tested positive following an outbreak of the virus at FCI Florence. BOP Multi-Level Mortality Review at 5. On December 10, 2020, he was brought to Health Services for an assessment after officers in his unit reported that he had been unsteady on his feet. Smith BOP Medical Records at 12. Mr. Smith's cellmate likewise indicated that he had been exhibiting confusion and not eating or drinking much. *Id*. He reported that these symptoms had begun about seven days earlier but worsened over the last three. BOP Medical Records at 12.

Consistent with these reports, Mr. Smith appeared dehydrated, unsteady on his feet, and slightly lethargic upon arrival at Health Services. *Id*. Medical staff completed an x-ray that revealed pneumonia related to his recent COVID-19 infection. *Id*. Mr. Smith became increasingly unstable while additional tests were ordered, at which point medical staff opted to transport him to the closest emergency room, where he ultimately passed away. *Id*. His official cause of death: acute respiratory distress syndrome ("ARDS")/pneumonia related to COVID-19. External Consultant Review at 1. ARDS is sometimes likened to "drowning on dry land."[11]

---

[11] Jim Morelli, *When COVID-19 kills: Rare lung syndrome like 'drowning on dry land'*, BOSTON 25 NEWS, (Mar. 18, 2020), https://www.boston25news.com/news/local/when-covid-19-kills-rare-lung-syndrome-like-drowning-dry-land/J4E2IIH5X5CENBTYS5O5F2XAGU/.

Notably, while in custody, Mr. Smith reportedly made considerable progress toward lasting sobriety by completing the Residential Drug Abuse Program—despite the fact that he was ineligible for a sentence reduction. FCI Florence RDAP Treatment Summary at 3; Dkt. 51 at 4. During the final phase of treatment, Mr. Smith told his counselor that he had overcome his fear of being judged and possessed a level of confidence he never thought possible in his life. *Id*. While he had previously had few intimate relationships, he reportedly believed that he could achieve healthy and positive relationships and had "a plan in place (support network) to build relationships that would support his sobriety." *Id*. He also stated that he never thought he could feel as much empathy for others as he did at the time of his interview in January of 2020. *Id*. at 4. His prognosis for his return to society, according to his drug treatment specialist: "good." *Id*. At the time of his sentencing (and back on his mental health medication), Mr. Smith wrote to the Court: "I would love to be out there with my loved ones and contributing to society in a positive way." Dkt. 46-1 at 2. He was scheduled to be released to a halfway house on November 25— only eight days after he tested positive for the COVID-19 that would ultimately kill him. BOP Medical Records at 1.

While imprinting these men's names in the Federal Supplement may be cold comfort to those they have left behind, it serves as a vivid reminder that incarcerated people endured exceptional suffering throughout the pandemic.[12] And though these three lives provide particularly stark illustrations of what incarcerated people encountered, it is not just those we lost who suffered but countless more: those who fell ill and recovered, those who lost friends and

---

[12] From our district, Joseph Ruben Castillo, Charles Purely Romero, Jimmie Largo, Trevor Wright, Glen White and Demetrio Hernández Quijas also died of COVID-19 complications while in custody.

loved ones, and those who lived in fear that they would be next but had little at their disposal to erect safeguards. Their suffering, like so much that occurs behind bars, largely went unseen by the general public, all while many on the outside equated their own pandemic lockdowns (replete with creature comforts and the ability to walk out the door at any time) to prison time.[13]

In seeking to understand the impact of the COVID-19 pandemic on those in prison, the voices of incarcerated people are especially illuminating. In April 2020, James Ellis, a man incarcerated at the Marion Correctional Facility in Ohio, recalled that after the prison population was tested, some officers stopped showing up for work. Nicole Lewis, *How We Survived COVID-19 in Prison*, THE MARSHALL PROJECT, (Apr. 22, 2021), https://www.themarshallproject.org/2021/04/23/how-we-survived-covid-19-in-prison. Mr. Ellis went on to write: "We felt like they had left us to die. On the inside, it felt like we were in the basement of a burning house with no way out. Some of the guys began having prayer circles. They would get in a circle and hold hands and pray to God." *Id.*

Another man, Christopher Walker, described being quarantined at a prison in Wisconsin in April of 2020:

> We were stuck in an 8-by-12-foot cell with nowhere to sit except for the bunk and no way to social distance or properly disinfect the room. We could only shower every other day. We couldn't go outside and get fresh air or wash our clothes. We had no access to the microwaves or the kiosk to send emails. A nurse came by every day to take our vital signs.

*Id.* A year later, Mr. Walker reflected: "This month will make 28 years behind bars for me. There has been no worse year than 2020." *Id.*

---

[13] Take, for example, the daytime talk show host Ellen DeGeneres, who joked that quarantining was like being in jail. Sonia Rao, *Ellen DeGeneres removes YouTube video in which she compares social distancing to 'being in jail'*, WASH. POST, (Apr. 8, 2020), https://www.washingtonpost.com/arts-entertainment/2020/04/08/ellen-degeneres-jail-coronavirus-video-backlash/.

Likewise, Bruce Bryant, a man incarcerated at the Sing Sing Correctional Facility in New York, described how front-of-mind death was in prison in May of 2020:

> For the past couple of weeks, I've been knocking on the wall each night to check on Francisco. You never know what a person's history is and what they are thinking in those dark moments.
> When someone passes away all that matters is who his friends are. We try to console each other by listening. I always tell my neighbor I am praying for him. And sometimes I pray for all the guys dealing with sick loved ones on the outside. Other than that it's simply, "another one bites the dust." There is no such thing as incarcerated people and the staff being "in this together." There's no compassion, and in some cases, there's even less compassion than usual.
> At the end of the day, people in prison only have each other. We often build real bonds. We have friendships that matter. I try to be a light in a dark place. Prison is a cold environment. It's up to us to create our own heat.

*Id.*

The Court, too, has an obligation to be a light in a dark place. While each individual incarcerated throughout the COVID-19 pandemic faced a unique set of circumstances and challenges, collectively these stories illustrate a troubling reality present here: the conditions of confinement during the COVID-19 pandemic resulted in a prison term that was substantially more severe than Mr. Martínez Encinias' sentencing judge could have contemplated when sentencing him in 2017. While Judge Reagan sought to carefully balance the information then available, he could not have foreseen the restrictions that the pandemic would precipitate (including lockdowns, upended programming, and the curtailment of visitation), the life-threatening health risks, nor the length of time these risks and deprivations would persist. *See also United States v. Reyes Filiciano*, No. 08-CR-1412-MV, 2023 WL 3881416, at *12 (D.N.M. June 8, 2023). These risks and restrictions were especially severe for individuals who, like Mr. Martínez Encinias, spent the entirety of the pandemic in a carceral setting.

Courts have long considered harsh conditions of confinement as a valid factor supporting a shorter custodial sentence. *See, e.g.*, *United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007)

(Finding the argument that "the harsher the conditions the shorter the sentence should be" had "enough merit" to allow a sentencing judge to take it into account.). But the COVID-19 pandemic brought courts into uncharted territory. In the words of the Hon. Robert Gregory, "[a] day in prison under the current conditions is a qualitatively different type of punishment than one day in prison used to be. In these times, drastically different." *United States v. Kibble*, 992 F.3d 326, 335 (4th Cir. 2021) (Gregory, C.J., concurring). To this day, incarcerated people regularly face isolation in solitary confinement, the suspension or curtailment of prison programs, restricted visitation, and limited access to nonessential medical care—all in an effort to keep COVID-19 at bay.[14] *See also id.* (collecting cases). The BOP itself has acknowledged that the operational modifications caused by the COVID-19 pandemic have placed a heavy burden on incarcerated people and their families.[15] As a result, courts nationwide have determined that "onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.'" *United States v. Hatcher*, No. 18-CR-454-KPF, 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021) (quoting *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)).

---

[14] *See, e.g.*, Raymond Williams, *Why COVID prison outbreaks will continue to be a major threat*, SLATE, (May 11, 2023), https://slate.com/news-and-politics/2023/05/covid-prison-outbreaks-threat.html; Alana Minkler & Colin Atagi, *12 infected in Sonoma County jail COVID-19 outbreak leading to court delays*, PRESS DEMOCRAT, (Mar. 17, 2023), https://www.pressdemocrat.com/article/news/12-infected-in-sonoma-county-jail-covid-19-outbreak-leading-to-court-delays/; Maria Flora, *Sheriff reassures families during jail COVID-19 outbreak*, LEBANON REPORTER, (Feb. 3, 2023), https://www.reporter.net/news/sheriff-reassures-families-during-jail-covid-19-outbreak/article_80598408-a32a-11ed-a88d-b35a188211c8.html.

[15] *Temporary Security Measures Implemented*, FED. BUREAU OF PRISONS, https://www.bop.gov/resources/news/20210116_precaution.jsp (last updated Jan. 16, 2021).

Here, the Court joins those courts in finding that the harshness of custodial sentences for individuals like Mr. Martínez Encinias—who were sentenced before the COVID-19 pandemic, or for whom the sentencing judge did not consider the harshness of pandemic prison time at sentencing—*may* constitute an extraordinary and compelling reason justifying relief in the form of compassionate release or a sentence reduction.[16] The Court is compelled to make this finding because "a day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison," and "[w]hile not intended as punishment, incarceration in such conditions is, unavoidably, more punishing." *United States v. Mcrae*, No. 17-CR-643-PAE, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021). Indeed, "while much of the world has reverted to pre-pandemic normalcy, life in BOP custody has not—if it ever will." *Ortiz*, 2023 WL 2229262, at *6.

It is for these reasons that courts that have declined to grant compassionate release based on an individual's risk of contracting COVID-19 have nonetheless done so for individuals who demonstrated that their imposed sentence was more severe than originally intended due to the pandemic. *See, e.g., United States v. Barraza Payan*, No. 18-CR-422-KPF, 2022 WL 17757779,

---

[16] *See, e.g.*, *United States v. Kitroser*, No. 15-CR-19-KPF, 2023 WL 3173513, at *6 (S.D.N.Y. May 1, 2023); *United States v. Vazquez*, No. 13-CR-869-KPF, 2023 WL 2386607, at *8 (S.D.N.Y. Mar. 6, 2023); *United States v. Malloy*, No. 07-CR-898-VM, 2023 WL 2237504, at *2 (S.D.N.Y. Feb. 27, 2023); *United States v. Ortiz*, No. 17-CR-2283-MMA, 2023 WL 2229262, at *6–7 (S.D. Cal. Feb. 24, 2023); *United States v. Kramer*, No. 16-CR-00322-EJD, 2023 WL 361092, at *4–5 (N.D. Cal. Jan. 23, 2023); *United States v. Oquendo*, No. 13-CR-357-KPF, 2023 WL 199609, at *6 (S.D.N.Y. Jan. 17, 2023); *Reynolds v. United States*, No. 99-CR-520-NGG, 2022 WL 1444167, at *4 (E.D.N.Y. May 6, 2022); *United States v. Lora*, 16-CR-44-KPF, 2022 WL 1055749, at *5-6 (S.D.N.Y. Apr. 8, 2022); *United States v. Valencia-Lopez*, No. 05-CR-841-NGG, 2022 WL 198604, at *3 (E.D.N.Y. Jan. 21, 2022); *United States v. McGee*, No. 12-CR-00052-EMC, 2021 WL 1660251, at *2 (N.D. Cal. Apr. 26, 2021); *United States v. Quinones*, No. 00-CR-00761-JSR, 2021 WL 797835, at *2 (S.D.N.Y. Feb. 27, 2021); *Rodriguez*, 492 F. Supp. 3d at 311.

at *5 (S.D.N.Y. Dec. 19, 2022); *United States v. Francisco-Ovalle*, No. 18-CR-526-AJN, 2022

WL 1094730, at *3 (S.D.N.Y. Apr. 12, 2022); *United States v. Rodriguez*, No. 05-CR-960-JPO,

2022 WL 158685, at *4 (S.D.N.Y. Jan. 18, 2022). In such situations, courts have concluded that

"pandemic-induced conditions of confinement can constitute extraordinary and compelling

circumstances warranting compassionate release, particularly for defendants who have (i) served

long sentences and (ii) been detained for the entirety of the pandemic." *Oquendo*, 2023 WL

199609, at *5.

The Court will do the same here. There can be no serious dispute that Mr. Martínez

Encinias, imprisoned for the entirety of the pandemic, has already served a long sentence, and

has experienced harsher conditions of confinement than could have been anticipated at his 2017

sentencing. While the Court recognizes that COVID-19 outbreaks in jails and prisons continue to

this day, the national emergency for COVID-19 lasted 37 months.[17] During this emergency, Mr.

Martínez Encinias was housed at the minimum-security camp at FCI Florence for roughly 20

months, FTC Oklahoma City for about two months, and FCI Bastrop for around 14 months.

Martínez Encinias BOP Arrival and Release Status. During the pandemic, a total of 1,586 people

---

[17] In response to the threat posed by the pandemic, then-President Donald J. Trump declared a
public health emergency under the Public Health Service Act on Jan. 31, 2020, issued two
national emergency declarations under both the Stafford Act and the National Emergencies Act
(NEA) on March 13, 2020, and invoked emergency powers via Executive Order under the
Defense Production Act on March 18, 2020. *Trump Declares State of Emergency for COVID-19*,
NCSL, https://www.ncsl.org/state-federal/trump-declares-state-of-emergency-for-covid-19 (last
updated Mar. 25, 2020). On April 10, 2023, President Joseph R. Biden signed a bill that
immediately ended the COVID-19 national emergency. Kelly Garrity, *Biden signs bill ending
COVID-19 national emergency*, Politico, (Apr. 10, 2023),
https://www.politico.com/news/2023/04/10/biden-ends-covid-19-national-emergency-00091313.

contracted COVID-19 at these facilities, and for seven of those individuals, the disease proved fatal.[18]

Mr. Martínez Encinias also did not escape unscathed from his time in these facilities. On January 21, 2021, at the end of an apparent COVID-19 outbreak at FCI Florence lasting from November of 2020 through January 2021, he tested positive and began to have symptoms the next night. Dkt. 1253-3 at 135. Over the next week his symptoms worsened ("difficulty breathing, fever, shakes and chills and has not been able to eat or drink since Friday") and by January 29, he "appear[ed] ill and vitals [were] concerning for COVID pneumonia with hypoxia." *Id*. at 154, 145. That day, Mr. Martínez Encinias reported that he could not breathe, felt weak, and was unable to easily walk across the room. *Id*. In addition, he reported severe pain while swallowing, body aches, and headache. *Id*. His symptoms were compounded by a lack of appetite and vomiting. *Id*. By February 1, he required more oxygen than FCI Florence could provide, and he was admitted to the local hospital via ambulance. *Id*. at 135. Three days into his week-long stay at the hospital, doctors noted that he had "declined since arriving at hospital but still has a good chance for recovery." *Id*. By February 8, Mr. Martínez Encinias' condition was no longer urgent, and he was returned to Florence but remained on oxygen "for a while." *Id*. at 132, 104.

Mr. Martínez Encinias was, given his medical profile, fortunate to survive this experience. But his medical records make clear that his COVID-19 hospitalization and eventual recovery left scars. In March of 2021, for example, he continued to report fatigue, low oxygen, and a heart racing. *Id*. at 114. Those complaints persisted ("[shortness of breath], resp[iratory]

---

[18] *BOP COVID-19 Statistics*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_statistics.html (last accessed Jul. 6, 2023).

problems, unable to exercise, not even walk a lap . . . dry cough."). *Id*. at 104. His records further

document that Mr. Martínez Encinias "was very active before COVID," but that after six months

of recovery, he was "still unable to walk." *Id.* Moreover, the ongoing pandemic interfered with

routine care for his unrelated medical issues. *See, e.g.*, *Id*. at 293. On one occasion, Mr. Martínez

Encinias was only given a limited visual exam, and not his regularly prescribed epidural

injection for back pain, because "BOP operations [were] modified due to COVID-19 pandemic,

including inmate cohorts with limited time outside of cell" and "[his] cohort was on lockdown

during sick call." *Id.* Moreover, Mr. Martínez Encinias was housed in facilities that experienced

documented lockdowns, staffing shortages, widespread infections, and deaths due to the

pandemic.[19] None of this was anticipated at sentencing in 2017.

> The Court's finding that Mr. Martínez Encinias has served a harsher prison sentence than

anticipated due to the COVID-19 pandemic invites discussion of remedy. Rather than assign, as

---

[19] *See, e.g.*, Carie Canterbury, *Federal Correctional Complex employees protest 'dangerous working conditions'*, CAÑON CITY DAILY RECORD, (Sep. 30, 2021), https://www.canoncitydailyrecord.com/2021/09/30/federal-correctional-complex-employees-protest-dangerous-working-conditions/; Paul DeBenedetto, *An Incarcerated Texan Says He Should Already Be Home. Why Is He Still In Federal Lockup?*, HOUSTON PUBLIC MEDIA, (Apr, 13, 2021), https://www.houstonpublicmedia.org/articles/news/criminal-justice/2021/04/13/395692/an-incarcerated-texan-says-he-should-already-be-home-why-is-he-still-in-federal-lockup/; Tracy Harmon, *Federal prison staffing in Florence a 'logistical nightmare' amid coronavirus pandemic*, PUEBLO CHIEFTAIN, (Dec. 11, 2020), https://www.chieftain.com/story/news/2020/12/11/florence-federal-prison-worker-details-covid-19-staffing-strain/6513673002/; *Bastrop inmate dies of COVID-19*, ELGIN COURIER, (Nov. 25, 2020), https://www.elgincourier.com/article/news-covid-19/bastrop-inmate-dies-covid-19; Michael Alcala, *Federal Correctional Complex in Florence ramps up inmate coronavirus testing*, CAÑON CITY DAILY RECORD, (Nov. 13, 2020), https://www.canoncitydailyrecord.com/2020/11/13/federal-correctional-complex-in-florence-ramps-up-inmate-testing/; Brandon Mulder, *Bastrop prison inmate: Coronavirus threat is 'ticking time bomb'*, AUSTIN AMERICAN-STATESMAN, (May 5, 2020), https://www.statesman.com/story/news/local/bastrop/2020/05/05/bastrop-prison-inmate-coronavirus-threat-is-ticking-time-bomb/1241202007/.

at least one court has, quantitative value to a day spent in prison during these 37 months, the
Court will simply note two things. *Cf. United States v. Valencia-Lopez*, No. 05-CR-841 (NGG),
2022 WL 198604, at *3 (E.D.N.Y. Jan. 21, 2022) (determining that time in custody during this
period was "essentially the equivalent of either time and a half or two times what would
ordinarily be served"). First, any sentence reduction granted on this basis will be done on a case-
by-case basis after a careful evaluation of the facts. This is not a pandemic discount available to
all simply by default. Second, it is highly unlikely that any reduction granted on these grounds
will exceed 37 months, the duration of the national emergency.

The Court notes that some have bristled at the notion of a pandemic credit for fear that
acknowledging this wrong so openly might empower too many to seek sentence reductions—a
fear, perhaps, of too much justice. *See, e.g.*, *United States v. Davis*, No. 01-CR-3106, 2023 WL
2837459, at *3 (D. Neb. Apr. 7, 2023) ("But most fundamentally, the Court is simply not
persuaded that the prison conditions occasioned by the pandemic are 'extraordinary and
compelling.' Compelling, not really . . . but *certainly* not 'extraordinary,' given that every
prisoner in the federal system has had the same experience.") (emphasis in the original); *United
States v. Ramirez*, No. 08-CR-746-15, 2023 WL 2078442, at *2 (N.D. Ill. Feb. 17, 2023) (A
compassionate release motion "is not the right vehicle" to challenge conditions of confinement.)
(citations omitted); *United States v. Ramirez*, 571 F. Supp. 3d 40, 47 (S.D.N.Y. 2021) ("If the
challenging conditions of confinement caused by the pandemic warranted a sentence reduction
here, essentially every inmate who has been in BOP custody at any time since March 2020
would be entitled to a sentence reduction."); *United States v. Everett*, No. 12-CR-162, 2021 WL
322182, at *2-*3 (W.D. Pa. Feb. 1, 2021) (COVID-19 mitigation conditions did not warrant

compassionate release where "[e]very prisoner in the facility and other BOP facilities is subject to [ ] similar conditions").

This Court respectfully disagrees. Specifically, the Court does not anticipate that acknowledging the unprecedented custodial conditions caused by the COVID-19 pandemic will result in the granting of inappropriate numbers of applications for sentence reductions. First, only those sentenced before the pandemic—or without its consideration—will be eligible for a reduction. Second, petitioners must provide evidence that their pandemic incarceration produced real, individualized, and cognizable harm. In Mr. Martínez Encinias' case, the Court relies heavily on the clear physical trauma he endured as a result of his hospitalization with COVID-19-induced pneumonia as well as the long-term health consequences it has caused him in making its determination. The Court also places weight on the fact that Mr. Martínez Encinias was housed in facilities that experienced documented lockdowns, staffing shortages, widespread infections, and deaths due to the pandemic. Not every incarcerated person can make theses showings. Finally, and most importantly, even if an incarcerated person is able to demonstrate that incarceration during the pandemic was substantively harsher than anticipated, courts are nevertheless required to weigh the § 3553(a) factors before granting any relief. It is there that many such motions fail, and will continue to fail.

Given these limitations, the Court is convinced that this decision will not result in the granting of inordinate numbers of petitions for compassionate release based on the pandemic. Nor does the Court believe that other forms of relief—including under the Eighth Amendment— are realistic, as some courts have suggested. *See, e.g.*, *United States v. Bridgewater*, 995 F.3d 591, 599 (7th Cir. 2021) (observing that federal inmates may challenge "medically unsafe conditions of confinement" by filing a civil suit under the Eighth Amendment), *cert. denied*, 142

S. Ct. 476 (2021); *United States v. Ogle*, No. 15-CR-40042-JPG, 2022 WL 2307377, at *4 (S.D. Ill. June 27, 2022) ("Should Ogle feel the conditions are unacceptable and not justified by a legitimate penological interest, he may pursue a separate conditions of confinement lawsuit."). Put simply: after 30 years in this role, the Court refuses to be desensitized to human suffering. In the context of a once-in-a-century pandemic that inflicted untold trauma and suffering, the least the Court can do is allow incarcerated people to educate the judiciary on their experiences and then consider, based on the unique facts presented, whether a sentence reduction is appropriate.

## II.     Mr. Martínez Encinias' rehabilitation serves as an additional extraordinary and compelling basis for release.

The Court believes that, on its own, the experience of the COVID-19 pandemic may serve as an extraordinary and compelling basis for a sentence reduction under the § 3553(a) factors. Others are not so sure. *See, e.g.*, *United States v. Gonzalez*, No. 19-CR-467-PKC, 2022 WL 16919842, at *5 (S.D.N.Y. Nov. 14, 2022) (noting that even if the petitioner endured harsh conditions of imprisonment during the pandemic, without more, such conditions are not "sufficiently 'extraordinary and compelling' to warrant compassionate release"). However, in this case, the Court will also base its extraordinary and compelling determination on the rehabilitation Mr. Martínez Encinias has demonstrated while in custody.

"'Rehabilitation of the defendant alone,' Congress has stated, 'shall not be considered an extraordinary and compelling reason.'" *McGee*, 992 F.3d at 1043 (quoting 28 U.S.C. § 994(t)). However, while it is not a standalone justification for compassionate release, courts may appropriately consider rehabilitation on a motion for compassionate release when combined with other factors. *See, e.g.*, *United States v. Eccleston*, No. CR 95-0014-JB, 2021 WL 2383520, at *35 (D.N.M. June 10, 2021) (Browning, J.) (counting "rehabilitative efforts" as one factor constituting extraordinary and compelling circumstances). Here, Mr. Martínez Encinias has

demonstrated rehabilitation throughout his over six years in custody. As of 2023, he has completed 45 educational courses in a variety of subject areas, preparing him well for a productive life when he returns to our community. Mr. Martínez Encinias' accomplishments include courses in parenting, job fair preparation, interviewing skills, resume writing, health and wellness, personal finance, employability skills, creative writing, life skills, and business. Dkt. 1253-9. In addition, Mr. Martínez Encinias has taken a course to help him obtain a commercial driver's license and completed a 2000-hour housekeeping apprenticeship. *Id*. These efforts demonstrate significant rehabilitation that the Court considers in tandem with Mr. Martínez Encinias' experience of the COVID-19 pandemic.

The Court thus finds that Mr. Martínez Encinias' experience of the COVID-19 pandemic and his demonstrated rehabilitation amount to extraordinary and compelling circumstances under 18 U.S.C. § 3582(c)(1)(A)(i). The Court therefore proceeds to consider whether relief in the form of a reduced sentence is warranted in light of the factors set forth in 18 U.S.C. § 3553(a).

### III.     The § 3553(a) factors weigh in favor of Mr. Martínez Encinias' release.

Before determining if release is warranted, the Court must consider public safety and the § 3553(a) factors. 18 U.S.C. §§ 3582(c)(1)(A)(ii); § 3553(a). These factors include: the nature and circumstances of the offense; the history and characteristics of the defendant; the risk of danger to the community; and the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment. 18 U.S.C. § 3553(a).

Mr. Martínez Encinias was convicted of three drug trafficking offenses. His misconduct was serious: he made the distribution of dangerous drugs (cocaine and heroin) possible. Moreover, firearms were involved, raising the potential for violence. (Thankfully none occurred.) However, as described *supra* pp. 3–4, Mr. Martínez Encinias received—and has

served—the harshest sentence, despite the fact that he was arguably not the most culpable of the 15 men charged. Similarly, although his crime was unacceptable, his educational efforts make clear that he has significantly improved his approach to life while in custody. The Court thus finds that the sentence reduction ordered here does not meaningfully undercut the force of the sentence originally imposed or its deterrent effect.

In addition, the Court finds that Mr. Martínez Encinias does not pose a risk of danger to the community. As described *supra* p. 2, he spent three years, five months, and 14 days on pretrial release in progressively less restrictive conditions. Home detention, third-party custodianship, and GPS monitoring were all removed as a result of Mr. Martínez Encinias' compliance with the Court's release order. At no point during this period did Mr. Martínez Encinias test positive for unauthorized substances or commit new crimes. Moreover, he maintained gainful employment throughout this period, and the Court is confident that he will do so again upon release. Providing further assurance of his future stability, he reportedly has "the full support of his wife and family" and plans to live with his father upon release. Dkt. 1247 at 23. The Court finally notes that Mr. Martínez Encinias —who is now nearly 51 years old—also faces a reduced risk of recidivism based on his age. According to a study from the Sentencing Commission, over an eight-year period, just 26.8 percent of 50- to 59-year-olds recidivated—in striking contrast to 67.6 percent of those under age 21.[20] These decreased rates held true regardless of the length of sentence imposed. *Id.*

Thus, a holistic review of the § 3553(a) factors—in combination with the extraordinary and compelling reasons identified above—compels the Court to reduce Mr. Martínez Encinias'

---

[20] KIM STEVEN HUNT & BILLY EASLEY II, U.S. SENT'G COMM'N, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS 3 (2017).

term of imprisonment to time served. The offense in this case was undoubtedly serious: law enforcement recovered substantial quantities of drugs, cash, and firearms from Mr. Martínez Encinias' and took down a sizeable drug trafficking organization. However, the Court believes that keeping Mr. Martínez Encinias in custody for the remainder of his term of imprisonment would fail to meaningfully advance the purposes of sentencing.

## CONCLUSION

For the reasons stated above, Mr. Martínez Encinias' Motion for Compassionate Release, Dkt. 1247, is hereby **GRANTED**. Exercising its authority under 18 U.S.C. § 3582(c)(1)(A)(i), the Court will reduce his term of imprisonment to time served. The BOP is directed to release Mr. Martínez Encinias so that he may begin his four-year term of supervised release. The government shall serve a copy of this order on the Warden at FCI La Tuna immediately.


ENTERED this 18 day of July 2023.


_____
MARTHA VAZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE